IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

KIMBERLY DAY,

           Plaintiff,                      CV-09-1261-SU

   v.                               FINDINGS AND
                                        RECOMMENDATION

UNITED PARCEL SERVICE, INC., a
foreign corporation.

           Defendant.

**FINDINGS AND RECOMMENDATION**

SULLIVAN, Magistrate Judge:

    Plaintiff, Kimberly Day, filed this action against United
Parcel Service ("UPS") alleging hostile work environment sexual
harassment in violation of Or. Rev. Stat. § 659A.030(1)(a),(b);
retaliation for complaints of sexual harassment in violation of
Title VII and Or. Rev. Stat. § 659A.030(1)(f); and common law
wrongful discharge.  Specifically, plaintiff alleges defendant

1 - FINDINGS AND RECOMMENDATION

subjected her to a hostile work environment based on her gender and ultimately terminated her employment with UPS in retaliation for plaintiff's complaints of sexual harassment in the workplace. Plaintiff voluntarily withdrew her common law wrongful discharge claim, acknowledging the existence of adequate statutory remedies. Pursuant to Fed. R. Civ. P. 56, defendant now moves for summary judgment on all of plaintiff's remaining claims.  The court heard oral argument on April 27, 2011.  For the reasons below, defendant's motion should be granted with respect to plaintiff's sexual harassment claim and denied as to her retaliation claim.

## FACTUAL BACKGROUND

In June 2005, plaintiff began working for UPS as a feeder driver of multi-trailer vehicles. (Pl. Compl. ¶ 7.)  Plaintiff lives in Hermiston, Oregon and drives to various UPS locations throughout the Pacific Northwest, including Portland. (Kimberly Day Dep. 17:24-18:7, Apr. 5, 2010). In 2006, plaintiff experienced difficulty sleeping due to coterminous work shifts. (Day Dec. ¶ 5.) At that time, plaintiff was taking an antidepressant and she submitted to defendant a doctor's note requesting a consistent work schedule to assist with her daily medication timetable. (Id.) An official accommodation was not made because plaintiff's sleep difficulties were resolved when defendant regularized her work schedule. (Day Dep. 38:7-39:24.)

2 - FINDINGS AND RECOMMENDATION

Also in 2006, plaintiff alleges that she overheard rude language and conversations of a sexual nature over her Citizens' Band ("CB") radio while driving into defendant's Portland location. (Day Decl. ¶ 2.) Such conversations included, for example, references to television episodes about clitoral hood removal, dialogue about pornographic films, words such as "bitch" and "man juice," and general discussions about sexual encounters. (Pl. Compl. ¶ 8.) A certain channel on the CB radio was used by some of the UPS drivers while driving into and working around the Portland yard and plaintiff believed she recognized some of the voices of UPS staff engaging in the offensive conversations. (Day Dep. 43:1-21, 110:4-5.) Defendant did not require plaintiff to listen to the CB radio while working; rather, plaintiff's exposure to such conversations was voluntary. (Day Dep. 44:8-13.) The CB radio is not provided by defendant and no official UPS business is conducted over the CB radio. (Day Dep. 42:5-9, 44:8-22.)

Plaintiff approached her direct supervisor to complain about the sexual nature of the conversations she overheard on her CB radio; she also requested that her complaint be submitted anonymously and chose not to identify to her supervisor any specific UPS employees engaging in the offensive banter. (Day Dep. 107:11-108:12, 110:2-9.) The supervisor expressed to plaintiff that he took her complaint seriously and would discuss

3 - FINDINGS AND RECOMMENDATION

the matter with the Portland yard manager. (Day Dep. 110:12-20.)
The following week, plaintiff's supervisor handed her a copy of
the official UPS sexual harassment policy, posted the policy in
the Hermiston office, and indicated to her that the matter had
been resolved. (Day Dep. 110:21-111:16.) At this point, the
offensive conversations over the CB radio ceased. (Pl. Compl.
¶9.)

      In 2007, however, plaintiff again heard offensive
conversations over the CB radio in the vicinity of the Portland
yard. (Id.) Plaintiff discussed the sexual nature of the CB radio
conversations with a co-worker in Hermiston while an operations
management specialist was standing nearby. (Day Dep. 115:7-
116:15.) At oral argument on defendant's summary judgment motion,
plaintiff explained that she did not notify her supervisor of the
renewed offensive conversations or utilize the anonymous UPS
complaint hotline because she felt that further complaints to UPS
personnel would be futile. (Oral Arg. Tr. 61:17-21, Apr. 27,
2011.)

      Instead, on July 24, 2008, plaintiff filed a complaint of
sexual harassment with the Equal Employment Opportunity
Commission ("EEOC"). (Pl. Compl. ¶11.) Both the EEOC and UPS
conducted an investigation into plaintiff's allegations of sexual
harassment. (Tefft Dep. 28:10-20.) Ultimately, the EEOC
determined that plaintiff's complaint and the ensuing

4 - FINDINGS AND RECOMMENDATION

investigation failed to establish sexual harassment. (Nicholle
Winters Decl. in Supp of Def. Mot. Summ. J. Ex. 5, Letter from
Frances Palmer, EEOC Enforcement Supervisor, to Kimberly Day,
Dec. 29, 2008). In its December 2008 letter to plaintiff, the
EEOC noted that unless plaintiff had notified defendant of
renewed offensive communications, defendant would not know to
conduct another investigation and also  pointed out that
plaintiff could limit her exposure to such conversations by
turning off her CB radio. (Id.)

On September 22, 2008, two months after plaintiff filed her
complaint with the EEOC, she arrived to work approximately one
hour late due to oversleeping. (Day Decl. ¶ 6.) Earlier,
plaintiff had requested some time off in September, 2008. On days
for which employees request personal time off, they are required
to call in to determine if they are obligated to work that day.
On September 25, plaintiff failed to call in to UPS dispatch as
she slept through the call in period. (Day Decl. ¶ 8.), (Day Dep.
57:1-58:4.) When plaintiff called in the following day, she
explained to her supervisor that she had overslept due to taking
the prescription sleep aid Lunesta the night before. (Day Dep.
55:15-56:11.) On October 14, 2008, plaintiff received a letter
from defendant's division manager that stated that she
(plaintiff) told "someone at UPS that she was having sleep
issues, including while driving. (Day Decl. ¶ 12.) Plaintiff

5 - FINDINGS AND RECOMMENDATION

denies making such a statement. (Id.) Plaintiff specifically denies making such a statement to her supervisor on September 26. (Day Decl. ¶ 13.)

A few months prior, another UPS driver had fallen asleep at the wheel and overturned his multi-trailer vehicle. (Day Dep. 54:8-16.) Plaintiff's supervisor informed management personnel, including UPS' occupational health supervisor, Laurie Wahlstrom, about plaintiff's sleep difficulties and her use of a prescription sleep medication. (Laurie Wahlstrom Decl. ¶ 3, April 7, 2010). On September 29, 2008, plaintiff was suspended from driving until she underwent a Department of Transportation ("DOT") medical exam. (Day Decl. ¶ 9.) For the duration of the suspension, defendant offered plaintiff paid, alternative work until she obtained a new DOT medical card. (Id.) Although plaintiff already held a valid DOT medical card, under the terms of her union's bargaining agreement, defendant reserved the right to request an additional medical exam at any time. (Judy Snyder Aff. in Opp. to Def's Mot. Summ. J. Ex. QQ, Western Region Teamsters Agreement, Dec. 19, 2007 - Jul. 13, 2013.)

Defendant scheduled a medical exam for plaintiff to occur on October 2, 2008, and wrote a letter to the medical clinic specifically requesting that the doctor discuss plaintiff's sleep difficulties and medications during her visit. (Wahlstrom Dep. 52:10-53:5; Pl's Dep. Ex. 113.) Plaintiff did not attend the

6 - FINDINGS AND RECOMMENDATION

appointment scheduled by defendant. (Day Decl. ¶10.) Instead,
plaintiff visited Dr. Fulper, from whom she had previously
obtained her DOT medical card. (Id.) Dr. Fulper issued plaintiff
another DOT medical card at this time.[1] (Id.) However, after Dr.
Fulper's office informed defendant's health supervisor that a
discussion of plaintiff's sleep medication did not take place,
plaintiff was notified that she would need to attend another
medical exam with the doctor originally chosen by defendant.
(Wahlstrom Dep. 76:3-78:25.)

Plaintiff's union representative provided her with the
provisions of her collective bargaining agreement relating to
required medical exams and urged her to attend the appointment
scheduled by defendant, cautioning that failure to do so would
result in disciplinary action. (Nicholle Winters Decl. Ex. 22,
Letter from Jeff Cuellar, Union Representative, to Kimberly Day,
Nov. 17, 2008.) Over the next two months, defendant scheduled
three separate medical exams for plaintiff. (Kathy Cash Dep.
27:4-9, Nov. 2, 2010). Because plaintiff "felt she was being
singled out and set up for discipline," she failed to arrive for
each appointment. (Pl.'s Mem. Opp'n. to Def.'s Mot. Summ. J.

---

[1]A dispute of fact exists as to the content of plaintiff's
discussions with this doctor: Dr. Fulper testified in his
deposition that plaintiff did not discuss her sleep difficulties
nor did she disclose that she was taking a prescription sleep aid
(James Fulper Dep. 22:2-24:19, Nov. 2, 2010); plaintiff testified
in her deposition that she told the doctor about her use of
Lunesta (Day Dep. 66:12-13).

14.) On December 3, 2008, defendant terminated plaintiff's employment. (Pl. Compl. ¶ 24.)

On December 29, 2008, plaintiff filed a retaliation complaint with the EEOC. (Id. at ¶ 25.) In January 2009, defendant and plaintiff's union entered into negotiations for a return-to-work settlement for plaintiff. (Id. at ¶ 26.) Under the terms of the agreement, in order to return to her position as a feeder driver, plaintiff was required to attend a medical exam with defendant's chosen physician, Dr. Flaiz. (Snyder Aff. in Opp. to Def's Mot. Summ. J. Ex. MM.) An appointment was set for January 28, 2009. (Pl. Compl. at ¶ 27.)

When plaintiff arrived for her appointment, she initially refused to sign the standard authorization forms required to see the doctor, citing privacy concerns. (Cash Dep. 34:2-22.) Dr. Flaiz advised his staff that he would not see plaintiff without first procuring the signed authorization forms. (T. Douglas Flaiz Dep. 16:21-17:2, nov. 2, 2010.) Dr. Flaiz testified in his deposition that a "heated discussion" ensued in which plaintiff appeared "disruptive" and "argumentative." (Flaiz Dep. 28:7, 34:21, 35:4.) As a result of this exchange, Dr. Flaiz informed his staff that he was no longer willing to accept plaintiff as his patient. (Flaiz Dep. 27:15-28:3.) Plaintiff left the clinic but returned approximately ten minutes later, requesting another appointment and consenting to sign the authorization forms. (Cash

8 - FINDINGS AND RECOMMENDATION

Dep. 48:2-25.) The clinic refused to reschedule plaintiff's appointment. (Id.) As a result of the failed appointment, on January 30, 2009, defendant reinstated plaintiff's termination. (Snyder Aff. in Opp. to Def's Mot. Summ. J. Ex. MM.) On October 28, 2009, plaintiff filed suit against defendant alleging sexual harassment and retaliation.

//

### STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. Id. at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### DISCUSSION

### I. Hostile Work Environment Sexual Harassment

Plaintiff alleges sexual harassment constituting a hostile work environment under Or. Rev. Stat. § 659A.030. Because § 659A.030 was patterned after Title VII, both Oregon and federal courts have considered federal Title VII cases instructive when

9 - FINDINGS AND RECOMMENDATION

construing state law.  Montgomery v. J.R. Simplot Co., 916 F.
Supp. 1033, 1038 (D. Or. 1994), aff'd, 76 F.3d 387, (9th Cir.
1996); Harris v. Pameco Corp., 170 Or. App. 164, 176, 12 P.3d 524
(2000).  See also A.L.P. Inc. v. Bureau of Labor and Industries,
161 Or. App. 417, 422, 984 P.2d 883 (1999) ("ORS 659.030 is
patterned after Title VII and [] we therefore consider federal
cases instructive.").

     Title VII guarantees employees "the right to work in an
environment free from discriminatory intimidation, ridicule, and
insult."  Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986).
Nonetheless, the standards for judging hostility are
"sufficiently demanding to ensure that Title VII does not become
a 'general civility code.'  Properly applied, they will filter
out complaints attacking 'the ordinary tribulations of the
workplace, such as the sporadic use of abusive language,
gender-related jokes, and occasional teasing.'"  Faragher v. City
of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations
omitted).

     Thus, to prevail on a hostile work environment sexual
harassment claim, plaintiff must establish a "pattern of ongoing
and persistent harassment sever enough to alter the conditions of
employment."  Draper v. Coeur Rochester, Inc., 147 F.3d 1104,
1108 (9th Cir. 1998).  To satisfy this requirement, plaintiff
must show that her workplace was "both objectively and

10 - FINDINGS AND RECOMMENDATION

subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher</u>, 524 U.S. at 787.  In addition, plaintiff must prove that any harassment took place "because of sex." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 80 (1998).  Workplace harassment, even harassment between men and women, is not "automatically discrimination because of sex merely because the words used have sexual content or connotations" and the plaintiff must prove that the conduct at issue was "not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex."  <u>Id.</u>

Plaintiff alleges that the offensive language she overheard on her CB radio subjected her to sexual harassment in the form of a hostile work environment.  Viewing the evidence in the light most favorable to plaintiff, the court finds that the conduct at issue - while offensive and inappropriate - did not so pollute the workplace as to alter the conditions of plaintiff's employment.  Plaintiff has shown that she perceived her workplace to be a hostile environment: she sought out her supervisor in 2006 to complain of the sexually explicit comments she heard over the CB radio near the Portland yard; she complained to a co-worker that she found conversations overheard on the CB radio to be offensive; and she ultimately filed an EEOC complaint regarding the sexual nature of the conversations. As such,

plaintiff has shown that her workplace was subjectively offensive.

Whether the workplace would be considered abusive by an "objective" reasonable person is a closer question.  To determine if an environment is sufficiently hostile or abusive so as to violate Title VII and Oregon law, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (internal citation omitted); see also Jordan v. Clark, 847 F.2d 1368, 1374-75 (9th Cir. 1988) (finding no hostile work environment where "off-color" jokes were told in workplace).

The conduct of plaintiff's co-workers primarily falls into the "offhand comments" and "mere offensive utterance" category of non-actionable discriminatory language.  Plaintiff overheard jokes of a sexual nature and the use of sexually explicit language while listening to her personal CB radio on her occasional trips to the Portland yard.  According to plaintiff's deposition, she overheard offensive conversations at or near only

the Portland yard, which she visited only sporadically.  There is
no evidence that the offensive language was directed at
plaintiff.  Although plaintiff claims that the speakers "knew"
she was listening, she never made her presence known on the radio
during the offensive conversations and there is no evidence the
speakers were directing their offensive language toward her.  In
addition, while plaintiff states in her deposition she considered
the conversations she overheard to be offensive, she never
claimed they were physically threatening or humiliating or that
they interfered with her work performance; indeed, by plaintiff's
own admission, she eventually chose to avoid the offensive
language by simply turning off her CB radio when working in the
Portland yard.

    The language overheard by plaintiff on her personal CB
radio, while certainly inappropriate, was neither severe nor
pervasive enough to alter the conditions of plaintiff's
employment.  See Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1111
(9th Cir. 2000) (finding no hostile work environment where the
supervisor referred to females as "castrating bitches,"
"Madonnas," or "Regina" in front of plaintiff on several
occasions, directly called plaintiff "Medea," and plaintiff
received letters from supervisor at home); Candelore v. Clark
County Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992)
(isolated incidents of sexual horseplay or inappropriate behavior

not so egregious as to render work environment hostile); <u>Jordan v. Clark</u>, 847 F.2d at 1374-75 (9th Cir. 1988) (off-color jokes told at work did not constitute abusive environment); <u>Benitez v. PGE</u>, 799 F. Supp. 1075, 1080-81 (D. Or. 1992) (sporadic comments or incidents of harassment, without more, will not support a hostile environment claim); ; <u>Kelleher v. Bank of the West</u>, No. 07-1002-HA, 2008 WL 3853367 (D. Or. Aug. 14, 2008) (finding no hostile work environment where co-workers called each other "ho," "slut," and "whore," drew pictures of a penis on a co-worker, and discussed how a co-worker's "butt" looked); <u>Arnold v. GI Joe's, Inc.</u>, No. 02-1313-KI, 2004 WL 2026431 (D. Or. Sept. 10, 2004) (finding no hostile work environment where supervisor directed foul language at plaintiff, used offensive language in the workplace, and showed plaintiff a magazine that contained a picture of a woman holding her hands over the nipples of her breasts). <u>But see</u> <u>Nichols v. Azteca Rest. Enters.</u>, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); <u>Anderson v. Reno</u>, 190 F.3d 930, 933-934 (9th Cir. 1999) (hostile work environment exists where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in public by drawing a pair of breasts on an easel while

the employee was making a presentation and then told the
assembled group that "this is your training bra session," and
where the employee received vulgar notes and was patted on the
buttocks and told she was "putting on weight down there"),
<u>abrogated on other grounds by</u> National R.R. Passenger Corp. v.
Morgan, 536 U.S. 101 (2002); Draper v. Coeur Rochester, 147 F.3d
1104, 1109 (9th Cir. 1998) (finding hostile work environment
where plaintiff's supervisor made repeated sexual remarks to her,
told her of his sexual fantasies and desire to have sex with her,
commented on her physical characteristics, and asked over a
loudspeaker if she needed help changing her clothes).

The court in no way condones the language and content of the
conversations overheard by plaintiff, and the court acknowledges
the discomfort this behavior caused plaintiff.  Nonetheless,
occasionally overhearing sexually explicit language on a personal
CB radio did not alter the conditions of plaintiff's employment
and thus her hostile work environment claim must fail.[2]

**II.  Retaliation**

Plaintiff also alleges defendant retaliated against her for
complaining of sexual harassment in the workplace, in violation

---

[2] The court notes that upon hearing plaintiff's complaint,
her supervisor informed the Portland yard manager and instructed
him to review the sexual harassment policy with workers at the
Portland yard.  Plaintiff admits that the offensive conversations
ceased soon after her complaint, and defendant was unaware that
the sexually explicit conversations had resumed until it received
notice of plaintiff's EEOC complaint.

of Title VII and Or. Rev. Stat. § 659A.030.  Title VII and Or.
Rev. Stat. § 659A.030 require an identical analysis, therefore
plaintiff's state and federal retaliation claims may be analyzed
together.  See Payne v. Apollo College-Portland, Inc., 327 F.
Supp.2d 1237, 1245 (D. Or. 2004) (citing Harris v. Pameco Corp.,
170 Or. App. at 178-179).

    Pursuant to the Supreme Court's decision in McDonnell
Douglas, plaintiff has the initial burden to establish a prima
facie case of discrimination; in so doing, plaintiff must present
sufficient admissible evidence to raise an inference that
misconduct occurred, but proof of actual discrimination is not
required.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04
(1973); Warren v. City of Carlsbad, 58 F.3d 439, 442 (9th Cir.
1995).  Once plaintiff establishes a prima facie case, the burden
shifts to defendant to articulate a legitimate, nondiscriminatory
reason for the employment action.  McDonnell Douglas, 411 U.S. at
802-04.  If defendant is successful, the burden returns to
plaintiff to show by a preponderance of the evidence the alleged
legitimate, nondiscriminatory reason for the employment action is
merely a pretext for discrimination.  Id.

    To establish a prima facie case of retaliation, an employee
must show 1) she engaged in a protected activity; 2) her employer
subjected her to an adverse employment action; and 3) a causal
link exists between the protected activity and the adverse

action.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir.
2000).  Plaintiff need only offer evidence which "gives rise to
an inference of unlawful discrimination."  Lowe v. City of
Monrovia, 775 F.2d 998, 1005 (9th Cir. 1985) (quotation omitted).
"The amount [of evidence] that must be produced in order to
create a prima facie case is 'very little.'"  Sischo-Nownejad v.
Merced Community College Dist., 934 F.2d 1104, 1111 (9th Cir.
1991).

Here, plaintiff establishes a prima facie case of
discrimination.  First, there is no dispute that plaintiff
engaged in a protected activity when she complained of sexual
harassment in the workplace, filing an EEOC complaint to that
effect.  Second, there is no dispute that plaintiff was subject
to an adverse employment action when she was terminated.  The
parties dispute whether defendant subjected her to adverse
employment actions prior to termination.  The Ninth Circuit has
held that "only non-trivial employment actions that would deter
reasonable employees from complaining about Title VII violations
will constitute actionable retaliation."  Brooks, 229 F.3d at 928
(citing Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000)).
Examples of sufficiently adverse employment actions include
termination, dissemination of a negative employment reference,
issuance of an undeserved negative performance review, and
refusal to consider for promotion; examples of insufficiently

adverse employment actions include declining to hold a job open for an employee and badmouthing an employee outside of the job reference context.  <u>Brooks</u>, 229 F.3d at 928-29.

Here, plaintiff claims she suffered adverse employment actions when defendant alleged she had been driving while drowsy; required her to undergo a DOT fitness exam despite possessing a valid DOT medical card; and suspended her from driving.  The court finds defendant's accusation that plaintiff drove while drowsy does not constitute an adverse employment action.  <u>See</u> <u>Brooks</u>, 229 F.3d at 929 ("badmouthing an employee outside the job reference context [does] not constitute adverse employment action") (citing <u>Nunez v. City of Los Angeles</u>, 147 F.3d 867, 875 (9th Cir. 1998)).  Plaintiff provides no evidence of harm to her reputation and does not allege that anyone knew of the allegedly damaging statement, other than plaintiff, her doctor, and the UPS management team directly involved in addressing plaintiff's sleep difficulties.

As for plaintiff's suspension, defendant contends plaintiff was only temporarily suspended from driving and was offered paid, alternative work until she completed an additional medical exam and obtained a new DOT medical card.  Although there is no dispute plaintiff reported difficulty sleeping and use of a sleep aid medication, the parties dispute whether plaintiff told her supervisor that her medication caused drowsiness, including while

driving.  Whether plaintiff admitted to drowsiness while driving,
and whether defendant relied upon that alleged admission to
determine its course of action, is a question of fact requiring a
credibility determination by the jury.  It is well-established
that "[c]redibility determinations must be resolved at trial, not
on summary judgment."  McGinest v. GTE Serv. Corp., 360 F.3d
1103, 1112 (9th Cir 2004).  Moreover, "[t]he evidence of the
nonmovant is to be believed, and all justifiable inferences are
to be drawn in [her] favor."  Anderson, 477 U.S. at 255.  If
defendant relied upon fabricated information to make its decision
to suspend plaintiff from driving, as plaintiff alleges, such
circumstances would likely deter a reasonable person from filing
a complaint about sexual harassment.  Giving plaintiff the
benefit of all reasonable inferences, under the circumstances
alleged here defendant's suspension from driving is an adverse
employment action.  Thus, plaintiff suffered adverse employment
actions when she was suspended from driving and when her
employment was terminated.

        Third, plaintiff must show that a causal link exists between
the protected activity and the adverse employment actions.  In
the Ninth Circuit, a causal link may be established based solely
on the timing of the adverse employment action in relation to the
protected activity.  See, e.g., Passantino v. Johnson & Johnson
Consumer Prods., 212 F.3d 493, 507 (9th Cir. 2000) (citing

Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)); Miller
v. Fairchild Indus., Inc., 885 F.2d 498, 505 (9th Cir. 1989);
Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997).  When
adverse employment actions are taken within a reasonable period
of time after complaints of discrimination have been made,
retaliatory intent may be inferred.  See Yartzoff, 809 F.2d at
1375-76 (finding causation based on timing of retaliation);
Miller, 885 F.2d at 505 (holding that discharges 42 and 59 days
after EEOC hearings were sufficient to establish prima facie case
of causation).

        Here, plaintiff filed a formal Charge of Discrimination with
the EEOC on July 24, 2008, and, shortly thereafter, defendant
commenced an internal investigation.  On September 29, 2008,
plaintiff was suspended from driving until she had completed an
additional DOT medical exam.  On December 3, 2008, defendant
terminated plaintiff's employment.  Although an inference of
retaliatory intent based on timing alone may be rebutted where
the employer lacked knowledge of the employee's protected
activity when initiating the adverse employment action, see
Yartzoff, 809 F.2d at 1376, here it is disputed whether those who
insisted upon the DOT exam and plaintiff's suspension knew of her
recent EEOC complaint.  Given the minimal standard requiring only
an "inference of discrimination," the temporal proximity of
plaintiff's protected activity and the adverse employment actions

could lead a reasonable trier of fact to find a causal link between them.  Therefore, plaintiff satisfies the elements of a prima facie case of retaliation.

The burden now shifts to defendant to provide a legitimate, nondiscriminatory reason for the adverse employment actions. Defendant contends plaintiff was suspended from driving and ultimately terminated due to her failure to undergo a DOT medical exam.  Citing safety concerns regarding plaintiff's sleep problems, defendant suspended plaintiff from driving until she could discuss her sleep medication with the doctor issuing her DOT medical card.  Under the terms of the collective bargaining agreement governing plaintiff's employment, defendant reserved the right to request an additional medical examination, at its own expense, even in cases where the employee already possessed a valid medical certificate.  Defendant exercised that right and provided plaintiff with timely notice of the scheduled medical exams.

The record shows that plaintiff repeatedly failed to attend the scheduled medical exams, despite being notified on multiple occasions by both company and union representatives that failure to do so would result in disciplinary action, up to and including termination.  Plaintiff's union representative also provided plaintiff with a copy of the portions of the collective bargaining agreement pertinent to required medical exams and

advised her to attend the exam scheduled by defendant.  After
plaintiff's failure to attend multiple medical exams at
defendant's expense, defendant terminated her employment.
Defendant has provided sufficient evidence of a legitimate,
nondiscriminatory reason for plaintiff's termination.

The burden returns to plaintiff to provide evidence that
defendant's reasons for suspension and termination are merely
pretext for discrimination.  Plaintiff may demonstrate pretext
"either directly by persuading the court that a discriminatory
reason more than likely motivated the employer or indirectly by
showing that the employer's proffered explanation is unworthy of
credence."  Texas Dept. of Community Affairs v. Burdine, 450 U.S.
248, 256 (1981).  A plaintiff in a discrimination case may
"survive summary judgment without producing any evidence of
discrimination beyond that constituting his prima facie case, if
that evidence raises a genuine issue of material fact regarding
the truth of the employer's proffered reason."  Chuang v. Univ.
of Cal. Davis, Bd. Of Trustees, 225 F.3d 1115, 1127 (9th Cir.
2000).  Moreover, the Ninth Circuit has stated that summary
judgment is "generally unsuitable in cases in which the plaintiff
has established a prima facie case because of the 'elusive
factual question' of intentional discrimination."  Yartzoff, 809
F.2d at 1377; see also Lowe , 775 F.2d at 1009 ("when a plaintiff
has established a prima facie inference of disparate treatment

through direct or circumstantial evidence of discriminatory intent, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision.").

In this case, whether plaintiff has provided sufficient evidence of pretext is a close question.  Defendant was justifiably concerned about the safety of its drivers who were experiencing sleep difficulties, especially given the serious, sleep-related accident involving a UPS driver which occurred only a few months before plaintiff's suspension from driving.  Under the terms of the collective bargaining agreement, defendant was authorized to require a DOT medical exam, even where employees already held valid DOT medical cards.  After plaintiff failed to appear at multiple medical appointments scheduled by, and at the expense of, her employer, defendant terminated plaintiff's employment.  In addition, defendant offered to reinstate plaintiff's employment in a negotiated return-to-work settlement requiring plaintiff to undergo the additional medical exam, which plaintiff failed to do.  Accordingly, defendant reinstated plaintiff's termination.

Plaintiff argues that she was singled out for a disciplinary track only after filing a complaint of sexual harassment with the EEOC.  When plaintiff experienced sleep complications in 2006, defendant did not require her to undergo an additional DOT

fitness exam; according to plaintiff, it was only after filing
the EEOC complaint that defendant chose to suspend her from
driving and investigate further her fitness for duty.  A question
of fact remains regarding whether the supervisors who made the
decision to suspend plaintiff from driving knew of her sexual
harassment complaint.  Plaintiff also alleges that defendant
fabricated a motive for requiring the DOT fitness exam,
specifically, that plaintiff had told her supervisor she was
experiencing drowsiness while driving; plaintiff contends that
retaliatory animus motivated her supervisor's alleged fabrication
of drowsiness.  In addition, plaintiff notes that despite
plaintiff attending a DOT medical exam with her own UPS-approved
physician, defendant insisted upon plaintiff visiting a specific
physician chosen by UPS.  Plaintiff argues that defendant's
insistence upon a certain physician was motivated by defendant's
desire to influence the doctor's evaluation.

    While the court acknowledges defendant's persuasive evidence
on the issue of pretext, disputes of material fact and the need
for further factual development preclude summary judgment.  Where
questions of fact exist as to the employer's motivation in a
discrimination case, summary judgment is not appropriate.  See,
e.g., Yartzoff, 809 F.2d at 1377; Lowe, 775 F.2d at 1009.
Therefore, defendant's motion for summary judgment regarding
plaintiff's retaliation claims should be denied.

**RECOMMENDATION**

For the foregoing reasons, defendant's motion for summary judgment (doc. 27) should be granted, in part, and denied, in part.  The motion should be GRANTED with regard to plaintiff's hostile work environment sexual harassment claim and DENIED with regard to plaintiff's federal and state retaliation claims.


**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due July 25, 2011.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 7th day of July, 2011.


/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge


25 - FINDINGS AND RECOMMENDATION